**IN THE FEDERAL COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

CATHERINE GILLENWATERS,
and
KEARA MAHONEY,
     **Plaintiffs,**

v.                                   **CASE NO. 4:19-cv-102**

YORK COUNTY SCHOOL BOARD,
and
HAROLD STRICKLAND,
     **Defendants**

**COMPLAINT**

Comes now your Plaintiffs, by counsel, and file this Complaint against the Defendants, in support of which they state as follows:

**I.     Introduction**

1.     This is a suit brought against the York County School Board under Title IX of the Education Amendments Act of 1972, as amended, and specifically 20 U.S.C. § 1681(a) and related provisions of law, alleging unlawful sexual harassment, assault, and discrimination. A private right of action is implied under Title IX, with money damages available as a remedy. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992). It is brought against Harold Strickland under 42 U.S.C. § 1983 and related provisions of law, for violation of the Fourteenth Amendment Equal Protection Clause by Harold Strickland. Additionally, state battery claims are alleged against Strickland. The suit relates to the conduct of Harold Strickland in late 2017 through the first part of 2018.

2.     The plaintiffs join their claims pursuant to FRCP 20, as their rights of relief arise out of the same series of transactions or occurrences and common questions of law or fact will

arise in this action. The Plaintiffs also join state claims under the Court's supplemental

jurisdiction, pursuant to Rule 18. The Plaintiffs join the Defendants with respect to the claims, as

the claims arise out of the same series of transactions or occurrences and questions of law or fact

common to all defendants will arise in the action

3.      This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331,

and it has jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. This Court is the

proper venue for this action under 28 U.S.C. § 1391 and Local Civil Rule 3, as a substantial part

of the events or omissions giving rise to the claim occurred in York County, Virginia.

4.      The York County School Board ("School Board") supervises Bruton High

School, located in the unincorporated community of Lightfoot, in York County, which is in the

York County School Division. *See* Va. Code §§ 22.1-29, -71.

5.      Bruton High School is an educational institution receiving federal funds.

Additionally, the York County School Division receives federal funds.

6.      In November 2017, the School Board hired Harold Strickland as the head coach

for the women's basketball team at Bruton High School. In that capacity, Strickland exercised

enormous control over aspects of the lives of the team members, including team membership,

practice and performance obligations, positions, and future scholarship eligibility and potential

educational opportunities based on the scholarship.

7.      In that position, he was to be in close proximity with the female players,

individually or jointly, often on a daily basis, and for periods of time. As a staff member of the

sports program, he would also have influence with other coaching staff, and with the school

administration.

8.       Strickland was also the In-School Suspension/Detention ("ISS") teacher. This gave him supervisory and disciplinary authority over students beyond the sports program, and interaction with students in private or semi-private settings. He had a classroom designated for his use, over which he had authority.

9.       Keara Mahoney and Catherine Gillenwaters were both students at Bruton High School in the 2017 to 2018 school year. Both of them were minors at the time of the incidents.

## II.      Facts Pertaining to Mahoney

10.      Shortly after being hired, Strickland began to engage in grooming behaviors towards Keara Mahoney, a junior who was a member of the women's basketball team. For instance:

   a. He told her that she was his favorite member of the basketball team and that he was always there for her.

   b. He often promised or intimated that she could get a college sports scholarship and would be able to go to colleges easily because he had significant connections with college coaches.

   c. He acquired Ms. Mahoney's number without her knowledge. He then started asking her to text him whenever she needed him.

   d. In December, Coach Strickland pretended to feature Mahoney in the rotation and gave her a starting position on the team, which she never had before. Coach Strickland further obtained her residential address and offered her rides from home so that he could take her to games alone. Feeling uncomfortable about the offers, Mahoney refused his rides, but Coach Strickland insisted on the arrangement.

3

11.     Mahoney reported this conduct to Assistant Coach Lakeisha Warren. Warren intervened to direct Strickland not to offer rides to Mahoney but failed to take further action to protect Mahoney.

12.     After Mahoney reported the rides to Warren, Strickland removed Mahoney from a starting position, in January 2018.

13.     Subsequently, Coach Strickland reinitiated his inappropriate grooming of Mahoney. This included:

    a.  He engaging her to participate in a one-on-one private basketball practice sessions. Coach Strickland made requests for such private practice sessions with Ms. Mahoney on a daily basis. Sometimes, he would initiate one-on-one practice with Mahoney if she arrived earlier than other team members.

    b.  He again offered to pick her up from her residence and transport her to these practices. She felt that if she didn't comply with his requests, he would reduce her play time or number of starts, and may not help her to get into college.

    c.  During a private practice session, Coach Strickland asked Mahoney to constantly engage in ball exercises where he put his hands on her hips and repeatedly pulled her butt against his groin, to the point that Mahoney felt his genitals. She felt humiliated and powerless, hoping the practice to end as quick as possible.  She felt she had to tolerate this inappropriate behavior to avoid any retaliation. In regular practice sessions, Coach Strickland would instead use a basketball resistance

band, as appropriate, when it was necessary to engage in such ball

exercises with the players, which would avoid any inappropriate

physical contact.

d.  To reward Mahoney for engaging in these one-on-one sessions, and as

further grooming, Strickland elevated Mahoney to be captain of the

women's basketball team. He also began to text Ms. Mahoney more

often and started inviting her to games of other institutions outside of

the school.

14.     Mahoney further noticed that Coach Strickland regularly appeared during her

lunch section and engaged in conversations with her. Students' lunch schedules were varied and

there were at least three different lunch sections to coordinate with students' class schedules.

Seeing Strickland often during her lunch caused Mahoney to believe Strickland might be

purposely following her schedule in order to talk with her. She would also see him in different

parts of the school at least twice a day.

15.     This behavior caused Mahoney feelings of substantial stress and anxiety, affecting

her ability to attend to her responsibilities as a student, such as homework and paying attention in

class. It caused her to cry at practices and at games, which her parents recognized as out of

character for her. However, she felt she would lose her position on the basketball team and

potential scholarship opportunities if she failed to comply with Strickland's requests and submit

to his behavior.

16.     Feeling humiliated by Strickland's constant grooming and harassments, Mahoney

eventually sought help from Coach Richard Honesty, the Athletic Director, by revealing to him

Coach Strickland's behaviors and also expressing her feelings of depression surrounding her

experience on the basketball team. Coach Honesty failed to report the incidents to other school officials or to take action to prevent recurrences of this behavior by Strickland, even though he had detailed knowledge of Coach Strickland's behavior and authority to take action as the Athletic Director.

17.     In February, Coach Strickland took Mahoney to a Menchville basketball game together, but he did not speak about basketball at all and even left early with her. For one Bruton women's basketball game in February, Coach Strickland ignored Warren's waning and offered Ms. Mahoney another ride home.

18.     Mahoney suffered a knee injury in February that limited her involvement in training and gameplay. Strickland became aggressive with her and cussed at her. Mahoney felt that she could not take more harassment from Strickland and thereafter quit the basketball team to escape him. Strickland, however, began to attend Mahoney's soccer games. Strickland continued the grooming behaviors, telling her for instance that "I wouldn't miss it [the soccer game]" and she was his "number one star." This behavior caused her to feel great anxiety to her.

19.     Prior to this behavior, Mahoney was passionate about sports and was very active in school sports. She played three sports and felt that she had a great chance to get a college scholarship in soccer. However, because she could not sustain the constant pressure and attention from Strickland, she subsequently gave up all the sports completely, including her favorite sport soccer.

20.     Mahoney was traumatized by this sexual harassment and manipulation, and she began her long-term therapy. She subsequently dropped out of Bruton High School prior to her senior year because of the experience.

21.     As a result of this conduct, Mahoney suffered severe emotional distress. More importantly, she was unable to finish her senior year in high school and has been in online high school program after dropping out from Bruton High School. She is significantly behind in applying for colleges.

### III.    Facts Pertaining to Gillenwaters

22.     Meanwhile, beginning in or around January 2018, Strickland began to engage in grooming behaviors with Catherine Gillenwaters. Gillenwaters was not a member of the basketball team and did not have substantive prior interactions with Strickland.

23.     After learning that Gillenwaters had an interest in joining Air Force, Strickland presented himself to her as a father figure who had many resources and connections in the military and was eager to help her with her future. Claiming that he wanted to mentor her concerning her interest in the Air Force, Strickland was repeatedly adamant in inviting Gillenwaters to his office/classroom.

24.     During these meetings, Strickland repeatedly encouraged Gillenwaters to leave her boyfriend. He also criticized her boyfriend but would abruptly end the conversations when someone else entered the room. Strickland tried to convince her that her current relationship wouldn't last if she chose to join the Air Force. Strickland would repeatedly ask Gillenwaters, "Did you leave your boyfriend yet?" in the school hallway, claiming that he was "teasing" her.

25.     After meeting with him a few times, Gillenwaters was concerned about the behavior she witnessed, and reported this behavior to her math teacher -- soccer coach Luke Taylor. Taylor was dismissive of the concerns, emphasizing that Strickland was a good man with a wife and kids and that he was just approaching her a bit awkwardly.

26. Based on this report of Taylor, Gillenwaters continued to meet with Strickland, in his office/classroom, alone. Being assured by Taylor, she considered Strickland as a useful resource whom she could trust.

27. Strickland then signed up for Snapchat (a cell phone or computer based instant messaging service) to contact Gillenwaters. Strickland would comment on her body and appearance and her sex life when alone with her.

28. Strickland made comments about how Gillenwaters had "lost her virginity" to her boyfriend and suggested that Gillenwaters would engage is lesbian sex if she went to a women's college, suggesting she would probably do it without thinking if she got drunk or was high.

29. In one of these conversations, Gillenwaters once told Strickland about an incident that occurred involving a man who annoyed her at her workplace. Strickland told Gillenwaters that this man "just wants you to sit on his face till you cum," and began asking Gillenwaters if she would engage in oral sex with him for money, or if she would do so if he were younger or better-looking, or if he put plastic wrap between her and his face. Gillenwatters immediately reported this to another student, and Strickland repeated these comments to the other student.

30. Gillenwaters again revealed this inappropriate conversation with Strickland and Stricklands degrading comments to Taylor, but Taylor simply told her to just "keep an eye on it." He subsequently acknowledged that he should have reported the conduct, given the information he had.

31. Strickland arranged private meetings with Gillenwaters at least 3 to 4 times in a month. Feeling extremely disgusted and humiliated by Strickland's comments during those meetings, Gillenwaters discontinued meeting with Strickland and tried to avoid him. When she

encountered Strickland, she tried to be pleasant to avoid conflict, but Strickland attempted

repeatedly to reengage her in grooming activity.

32.     Similar to his grooming strategy toward Mahoney, Strickland would often come

to Gillenwaters during her lunch time. Gillenwaters then realized that Strickland might have

intentionally learned about her lunch schedule and followed it accordingly.

33.     On multiple occasions, he told her that he missed their talks and initiated

unwanted hugs and touching. On another occasion, he suggested taking some of the girls on the

basketball team to the movies and asked for her number. He referred to this as a "date," and

initiating a hug on that occasion as well.

34.     Ms. Gillenwaters started feeling stressed about going  places outside of her

classroom. When the school bell rang, she felt anxiety that Strickland would come out of his

classroom and initiate conversations with her or hug/touch her. She felt that Strickland probably

knew her schedule and purposely waited for her in certain locations in order to talk with her. She

would see him 2 to 3 times a day. She even felt extremely uncomfortable going to the school

cafeteria because she often encountered Strickland at the cafeteria. Strickland would not miss a

chance to invite her to "hang out" with him and ask her to "stop by" his office/classroom. During

this period of time, Ms. Gillenwaters started to experience panic and fear` while walking in the

school hallway, because Strickland was "always there". Receiving no help from Coach Taylor

after multiple complaints, she was convinced that no adult teachers would help her.

35.     Strickland's harassing behaviors targeting Ms. Gillenwaters lasted for at least

three months, from January 2018 to March 2018.

36.     Under extreme stress, she felt distracted from the classes and could not focus on

her studying. By the end of the semester, she felt that she had lost control over her schoolwork.

Her grades dropped dramatically, with her English dropping from B/C to F and Biology II from

B/C to F.

37.     She suffered from extreme distress due to the traumatic experience and started

therapy to cope with it.

38.     Her negative experiences with Strickland also influenced her to change her plans.

She determined not to pursue the military, and not to attend the women's college of Mary

Baldwin, even after receiving an admission offer.

## IV.     Claims

### COUNT I
### Violation of Mahoney's Title IX Rights
### Against York County School Board

39.     The allegations of this complaint are incorporated in this Count.

40.     20 U.S.C. § 1681 provides, in relevant part that "No person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial

assistance."

41.     As stated above, Mahoney was enrolled at an educational institution receiving

federal funds.

42.     As supported by the allegations above, Mahoney was subjected to severe and

pervasive harassment and unwanted physical contact based on sex.

43.     As supported by the allegations above, the harassment was sufficiently severe or

pervasive to create a hostile environment in an educational program or activity.

44.     As supported by the allegations above, including specifically the reports of suspicious or objectionable conduct to Warren, Honesty, and Taylor, the institution had actual knowledge of coach/ISS teacher-on-student sexual harassment.

45.     As supported by the allegations above, between at least January 2018 and February 2018, the institution's response to the conduct was clearly unreasonable, causing Mahoney compensable damages.

## COUNT II
## Violation of Gillenwaters' Title IX Rights
## Against York County School Board

46.     The allegations of this complaint are incorporated in this Count.

47.     20 U.S.C. § 1681 provides, in relevant part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

48.     As stated above, Gillenwaters was enrolled at an educational institution receiving federal funds.

49.     As supported by the allegations above, Gillenwaters was subjected to severe and pervasive harassment and unwanted physical contact based on sex.

50.     As supported by the allegations above, the harassment was sufficiently severe or pervasive to create a hostile environment in an educational program or activity.

51.     As supported by the allegations above, including specifically the reports of suspicious or objectionable conduct to Warren, Honesty, and Taylor, the institution had actual knowledge of coach/ISS teacher-on-student sexual harassment.

52.     As supported by the allegations above, between at least January 2018 and March 2018, the institution's response to the conduct was clearly unreasonable, causing Gillenwaters compensable damages.

## COUNT III
### Violation of Mahoney's Equal Protection Rights
### Against Strickland

53.     The allegations of this complaint are incorporated in this Count.

54.     As supported by the allegations above, between November 2017 and February 2018, Strickland, acting under color of law as an employee of the York County School Division, deprived Mahoney of her Fourteenth Amendment right to be free from sexual harassment in a public educational setting. As supported by his allegations above, his conduct was severe or pervasive to interfere unreasonably with her educational activities. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007). Mahoney suffered damages that are compensable under 42 U.S.C. § 1983.

55.     Strickland's conduct was malicious, intentional, or recklessly or callously indifferent to Mahoney's protected rights. As such, an award of punitive damages is appropriate.

## COUNT IV
### Violation of Gillenwater's Equal Protection Rights
### Against Strickland

56.     The allegations of this complaint are incorporated in this Count.

57.     As supported by the allegations above, between January 2018 and March 2018, Strickland, acting under color of law as an employee of the York County School Division, deprived Gillenwaters of her Fourteenth Amendment right to be free from sexual harassment in a public educational setting. As supported by his allegations above, his conduct was severe or pervasive to interfere unreasonably with her educational activities. *See Jennings v. Univ. of N.C.*,

482 F.3d 686, 701 (4th Cir. 2007). Gillenwaters suffered damages that are compensable under 42 U.S.C. § 1983.

58.     Strickland's conduct was malicious, intentional, or recklessly or callously indifferent to Gillenwaters's protected rights. As such, an award of punitive damages is appropriate.

## COUNT V
### Battery of Mahoney
### Against Strickland

59.     The allegations of this complaint are incorporated in this Count.

60.     As supported by the allegations above, Strickland engaged in intentional, unwelcomed, physical contact with Mahoney. Compensatory and punitive damages are appropriate.

## COUNT VI
### Battery of Gillenwaters
### Against Strickland

61.     The allegations of this complaint are incorporated in this Count.

62.     As supported by the allegations above, Strickland engaged in intentional, unwelcomed, physical contact with Gillenwaters. Compensatory and punitive damages are appropriate.

63. **Ad Damnum**

Wherefore, the Plaintiff's each request judgment against the defendants in the amount of $50,000 in compensatory damages, jointly and/or severally, and in punitive damages against Harold Strickland, along with an award of costs and attorney fees pursuant to 42 U. S. C. § 1988, and such further and additional relief as may be appropriate.

TRIAL BY JURY DEMANDED.

**Respectfully requested,**
**CATHERINE GILLENWATERS,**
**And KEARA MAHONEY**
By:  /s/ Andrew T. Bodoh
        Counsel

Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-2105
*Lead Counsel for Keara Mahoney and Catherine Gillenwaters*

William Peyton Akers, Esq. (VSB 89933)
peyton@aclawva.com
**AKERS & CLEATOR LAW GROUP P.L.L.C.**
291 McLaws Circle Suite 1
Williamsburg, VA 23185
Phone: (757) 707-8838
Fax: (757) 707-8828
*Counsel for Keara Mahoney and Catherine Gillenwaters*